THE CEDAR RAPIDS WATER COMPANY, Appellee, v. THE CITY OF CEDAR RAPIDS, Appellant.

Action to Restrain Enforcement of Ordinance: FRANCHISE DEFINED.
1   An ordinance granting to a corporation the exclusive right to supply a city with water is a franchise.

Franchise: TERM AND VALIDITY OF. The Code of 1873 provided that a city could not grant a right to operate a system of waterworks for a term of more than 25 years. The ordinance in question granted such right for 25 years ''and an equal right thereafter with all others supplying the city of Cedar Rapids with water.'' *Held*, the grant for 25 years was valid, and for the period in excess of 25 years it was void.

Legalizing Act: INVALID. An act of the General Assembly legalizing the void portion of such ordinance is invalid, on the ground that it violates article 1, section 6, and article 3, section 30 of the constitution.

Franchise is a Contract: VIOLATION OF: ORDINARY ACTION. Where a city grants a franchise to a corporation for a term authorized by law, and the conditions thereof are accepted, the same constitutes a contract between the parties, a violation of which is the subject of litigation in an ordinary proceeding.

Injunction: CITY MAY SHOW EXPIRATION OF FRANCHISE. In a suit by the corporation against the city, brought after the expiration of its franchise rights, to restrain the enforcement of an ordinance limiting the water rates to be charged thereafter, the city may show in defense that the franchise has expired, and the corporation has no further rights thereunder.

Color of Right: DENIAL OF: WAIVER. Where a city attempts by ordinance to confer upon a corporation a right which it has no power to grant, the acceptance and use by the corporation of the privileges attempted to be granted will not constitute a color of right which the city may not deny in an ordinary action; nor will the acceptance by the corporation of such privileges so illegally granted constitute a waiver by the city of its rights.

Termination of Franchise: EFFECT OF PROPERTY. Where a corporation accepts the benefits of a franchise, with knowledge of its termination, it cannot complain when the city insists that the termination of the franchise be observed, that such termination may affect the value of its property.

Water Rates: CITY MAY DETERMINE. A city has power under Code, section 725 to regulate and fix the rates at which a corporation supplying the city with water shall furnish the same.

Rates: MUST BE REASONABLE. Where a corporation after the expiration of its franchise continues to supply water, and the city accepts the service, the city and patrons must pay reasonable compensation therefor; and if the city prescribes rates they must not be arbitrary or destructive of the corporate property.

Rates: WHEN COURT WILL FIX: WHAT REASONABLE. Courts will not interfere with the schedule of rates fixed by the city unless so unreasonable as to amount to taking of property for public use without just compensation; and where the estimated net earnings under the rates fixed by the city will amount to from four and two-fifths to five and one-half per cent. interest on the value of its property, or six and one-half per cent. on its total capital stock and bonds, the court will not interfere.

*Appeal from Linn District Court.*—HON. W. N. TRIECH-LER, Judge.

MONDAY, OCTOBER 27, 1902.

ACTION in equity to restrain enforcement of a city ordinance. The district court entered a decree as prayed, and defendant appeals.—*Reversed.*

*John N. Hughes, J. W. Jamison,* and *E. H. Crocker* for appellant.

*Chas. A. Clark & Son* and *Wm. G. Clark* for appellee.

WEAVER, J.—The plaintiff alleges that it is a corporation organized for pecuniary profit under the laws of this state; that on February 19, 1875, the defendant, by its council, adopted an ordinance granting to the plaintiff the exclusive privilege for twenty-five years, and an equal right thereafter with others, of furnishing the city with a water supply; that by its terms said ordinance was made a contract between plaintiff and defendant, and was not subject to change or amendment without mutual consent; that, under the statute then existing, the city had no right or power to fix or regulate the rates to be charged by the water company to private consumers; that on March 8, 1876, the legislature of the state passed an act legalizing the ordinance aforesaid, and declaring it binding and effective for all the purposes therein expressed; that, proceeding under its said contract, plaintiff constructed and

installed waterworks and improvements to the aggregate cost of over $400,000, and that the property so created represents a present value of over $500,000; that on June 8, 1900, the city, by its council, wrongfully and without consent of plaintiff passed an ordinance fixing a schedule of rates above which defendants should not be allowed to charge or receive compensation for water service furnished to private consumers; that the rates so fixed are not compensatory, and are wholly insufficient to pay necessary expenses and charges and return any adequate or reasonable profit upon the investment made in the works, and said ordinance is therefore unreasonable, and has the direct effect to deprive plaintiff of its property without due process of law, and to deny to plaintiff the equal protection of the law, in violation of the fourteenth amendment to the constitution of the United States. Upon these and other allegations of the same general tendency, plaintiff asks that said ordinance last named be declared void, and its enforcement enjoined. The defendant admits the passage of the ordinance of February 19, 1875, constituting the contract between the parties, as well as the ordinance of June 8, 1900, the validity of which is assailed by the plaintiff, and admits the construction and operation by plaintiff of a system of waterworks in said city, but denies that its cost or present value exceeds $300,000. It further answers that the rates for water service, as fixed by the later ordinance, are reasonable, and sufficient to furnish plaintiff full compensation for the service so rendered, and return a fair profit upon the investment represented by the works. Defendant denies that there is now any contract existing between it and said water company, and says that the franchise of the plaintiff expired on February 19, 1900, and that all contractual relations theretofore existing between the parties were then terminated, and that since said date the plaintiff has occupied the streets of the city by sufferance only, and without right, and cannot com-

plain of the conditions which may be imposed by the city upon its further occupancy. Upon the issues thus joined, a large amount of testimony was taken, and the court found and adjudged that the rates fixed by the ordinance of June 8, 1900, were insufficient to afford a fair and reasonable return upon the investment represented by the waterworks, and that the defendant should be enjoined from enforcing the same. From this adjudication, the defendant appeals.

The arguments of counsel are largely devoted to the following questions: (1) Was the right which the plaintiff acquired under the ordinance of 1875 to furnish the city water supply a franchise? (2) Did such right or franchise expire at the termination of the twenty-five year period named in the ordinance? (3) Does the legalizing act of March 8, 1876, give plaintiff any other or greater right than was originally conferred by the ordinance? (4) May the defendant in this proceeding deny the present existence of such right or franchise in the plaintiff? (5) Has the city any power to regulate the rates which may be levied by the water company? (6) Are the rates prescribed by the ordinance of 1900 reasonable? These and minor questions which naturally cluster around them we will now proceed to consider so far as it is necessary to a disposition of defendant's appeal.

I. The term "franchise" is defined in various ways, and its meaning depends more or less upon the connection in which the word is employed. Without going into any extended research as to its origin, it may be said that a franchise is a special privilege conferred by governmental authority upon individuals, and which does not belong to citizens of the country generally, as a matter of common right. It is also to be regarded as a generic term covering all rights granted to a corporation by legislative act or statute. See "Franchise," Anderson's Law Dictionary. A corporation (by which is meant an associa-

<span style="font-variant: small-caps">Cities: franchise defined.</span>

tion of individuals organized into a body lawfully exercising corporate powers) is itself a franchise, and the different powers which may be exercised by the corporation are also franchises. In the first illustration above used, the franchise is the privilege held by the individual members to be a corporation and exercise corporate powers; and in the second, the franchise is the privilege which is granted to the corporation when organized to perform certain acts or to carry on certain business. The word is also often used with special reference to a privilege granted by the state, or by some minor municipality acting under the authority of the state, to conduct a business of public utility,—such, for instance, as supplying the public with water, light, transportation, and other conveniences. It follows, then, without argument, that under the ordinance of 1875 the plaintiff obtained a privilege which may properly be called a "franchise," in the common acceptance of that term; that is, the right or privilege of supplying the city of Cedar Rapids and its inhabitants with water, and of occupying the streets of the city for that purpose. It must be said, however, that plaintiff's privilege of supplying the city with water is not, in the strict sense of the word, a "corporate franchise"; that is, it is not a privilege derived from or obtained by the act of incorporation. Its charter rights and privileges are such only as come to it through its organization under the general corporation law, and did not and could not include the right to furnish water to the defendant city. Such right could only be acquired after the incorporation was accomplished, and by the agreement and consent of the city. True, the grant of corporate capacity was from the state, and the subsequent grant from the city may be said theoretically· to have been also from the state. But the city was under no legal obligation to make the grant, and might have refused it without in any manner affecting the plaintiff's corporate rights, powers, or franchises. By making the grant it gave

the plaintiff what may be called an "additional franchise or privilege." See *Bridge Co. v. Prange,* 35 Mich. 400 (24 Am. Rep. 585). And like other franchises, it constituted a contract between the parties, having in general the same incidents and subject to the same interpretation which would obtain between other contracting parties. It is not, however, a matter of vital importance by what name we call the right obtained by plaintiff. The defendant, as we understand, concedes that the plaintiff did obtain a grant—whether it be called a "franchise," "privilege," or "license"—to supply the city with water for twenty-five years; and the question sought to be raised is whether that right still exists, and, if it exists, whether plaintiff is entitled to the relief demanded.

II. Does the franchise or privilege conferred upon the plaintiff to furnish the city water supply remain effective after the expiration of the period of twenty-five years? The law under which cities and towns were acting at the date of the ordinance of 1875 provided that, when the right to build and operate waterworks was granted to private individuals or corporations, such grant should be made "to inure for a term of not more than twenty-five years." Code 1873, section 473. The word "inure," in the sense here employed, is defined, "To take or have effect; to operate." Anderson's Law Dictionary. Section one of the ordinance of 1875 described the franchise granted as being "the exclusive privilege for twenty-five years and an equal right thereafter with all others of supplying the city of Cedar Rapids with water." Section two of the same ordinance provided that the water company should "have during said term of twenty-five years the right to use any street, avenue or lane for the purpose of laying down pipes or other fixtures for conveying and distributing water." In view of the statutory limitation above quoted upon the power of cities and towns to enter into

2. FRANCHISE: extension of statutory period: validity of.

such contracts and make such grants, it would seem too clear for argument that so much of the ordinance of 1875 as attempts to extend the grant thereby made beyond the term of twenty-five years is void. That a contract made in violation of law cannot be enforced, is elementary. The same is true of any contract of a municipal corporation for which there is no express or implied statutory authority. *City of Somerset v. Smith* (Ky.) 49 S. W. Rep. 456; *Logan v. Pyne*, 43 Iowa, 524; *Becker v. Waterworks*, 79 Iowa, 422; *Clark v. City of Des Moines*, 19 Iowa, 199; *McPherson v. Foster*, 43 Iowa, 57; *Fox v. City of New Orleans*, 12 La. Ann. 154 (68 Am. Dec. 766); *President, etc., v. Henderson*, 8 Serg. & R. 219 (11 Am. Dec. 593); *City of Chaska v. Hedman*, 53 Minn. 525 (55 N. W. Rep. 737); *City of Wellston v. Morgan*, 59 Ohio St. 147 (52 N. E. Rep. 127). Grants or franchises in perpetuity or for unreasonably long periods of time are generally regarded as against public policy, and, if ever valid, the authority therefor must be found in the constitution or statutes of the state. *Richmond Co. Gas Light Co. v. Town of Middletown*, 59 N. Y. 228; *City of Brenham v. Brenham Water Co.*, 67 Tex. 542 (4 S. W. Rep. 143); *Long v. City of Duluth*, 49 Minn. 280 (51 N. W. Rep. 913, 32 Am. St. Rep. 547); *Thrift v. Elizabeth City*, 122 N. C. 31 (30 S. E. Rep. 349, 44 L. R. A. 427). And it doubtless was with this principle in view that the legislature expressly denied to a city government power to grant a franchise of this nature for any term exceeding twenty-five years. That enactment enters into and controls every grant made thereunder, and courts have no alternative but to recognize its authority. The invalidity of the ordinance provision referred to does not, however, affect the grant for the term of twenty-five years. It is entirely severable from the grant which the city was authorized to make and did make, and the rights of the parties are to be considered and the contract between

them is to be construed, precisely as if the words, "and thereafter an equal right with others" had never been embodied in the ordinance. Where the contract is severable. and one part or provision is void, the void provision may be rejected, and the contract enforced as to the remainder. *McPherson v. Foster, supra*; *Baker v. Washington County*, 26 Iowa, 154; *Hitchcock v. Galveston*, 96 U. S. 341 (24 L. Ed. 659). This branch of the discussion has been based, upon the plaintiff's theory that the words "and an equal right thereafter with all others" were intended as the grant of a franchise beyond the period of twenty-five years. We think, however, it is not a violent rendering of the language to construe it simply as an undertaking that the water company shall have an equal opportunity with others in competing for a new franchise when the original exclusive grant for the twenty-five years has expired.

III. Does the legalizing act of March, 1876, serve to prolong the life of plaintiff's franchise beyond the term of twenty-five years? In our judgment, this question must be answered in the negative. If the legislature, in enacting section 473 of the Code of 1873, had added thereto a proviso as follows, "Provided, that the limitations herein made upon the powers of cities and towns shall not apply to the city of Cedar Rapids," we think no lawyer would contend that under our constitution such legislation would be of any validity. Const. Iowa, article 1, section 6; Id. article 3, section 30. But the effect of the legalizing act under consideration, in so far as it is applicable to the grant of a franchise beyond the limit of twenty-five years, is no more or less than an attempt to except or release the city of Cedar Rapids from the operation of a general statute which remains in full force against all other municipalities of the state, and thus accomplish by the device of a legalizing act that which the legislature could not do by direct enactment. This, we have already held cannot be done

3. VOID ordinance legalizing act: invalidity of.

*Independent School Dist. v. City of Burlington,* 60 Iowa, 500; *Stange v. City of Dubuque,* 62 Iowa, 304. It will not do to say, as urged by counsel, that,. if the legislature has not the power to grant a franchise by a special act, it cannot grant such power to a city, and that the legislature may by special act "grant to a particular corporation a particular franchise for a particular city without being subject to any constitutional inhibition." To accept that proposition is to open the door to the very evil which the constitutional provisions above cited were intended to avoid. The constitution seems to have been framed with special reference to the preservation of merely local interests from legislative interference, except through the medium of general laws having a uniform operation throughout the state. The ancient system under which the legislature passed special acts creating private and municipal corporations, establishing highways, locating and changing county seats, excepting certain counties from the operation of general statutes, and other similar enactments, did not appeal to the favor of our people, and, as has been done by most of the newer states, it was abandoned, and purely local matters are left as far as possible to the discretion of local municipalities acting under the authority of general statutes. For instance, under our general statute one city may pave one or all streets with brick, and another may pave with granite or asphalt; one may pay the cost thus incurred by general taxation, and another may assess it upon the abutting property; one may exact a high license upon hotels, restaurants, and billiard rooms, and another may exact a low license, or none at all; and no one questions the validity of this exercise of local municipal power. But it would be a startling proposition to say that under the constitution of Iowa the legislature may do these things by special acts applicable only to particular, named cities, —a result which must logically follow upon the proposition asserted by counsel that the legislature can delegate

to a city no power which it cannot itself exercise by special statute. · The power of the legislature is, of course, practically unlimited, even in local matters, in the absence of constitutional restriction; and the prohibition of local or special legislation in no manner prevents that body from clothing cities and towns, through general statutes, with authority to do those things which are forbidden to itself. In other words, the constitution does not operate to forbid all local regulations and ordinances suitable to the peculiar circumstances of particular towns and cities, but it does forbid the exercise of this function by direct, special act of the legislature. Such we think the plain meaning of the constitutional provisions in question, and such, also we think has been their universal interpretation by the courts.    Independent of the propositions thus far discussed, and which we think decisive of this branch of the controversy, it is a very serious question (which we are not required here to decide) whether it is in the power of the legislature to give effect to a contract which is void for want of capacity on the part of the city to enter into it. See *Hasbrouck v. City of Milwaukee*, 13 Wis. 37 (80 Am. Dec. 718.)    It follows from the conclusions above announced that the legalizing act of 1876 gave to the franchise conferred by the ordinance of 1875 no life or validity beyond the term of twenty-five years which it did not originally possess.

IV.    May the defendant in this proceeding deny the present existence of the right or franchise claimed by the plaintiff?    It is the theory of the plaintiff that in its present use of the streets of the city, and in supplying water to the city and its inhabitants, it is acting under a franchise which if not strictly rightful is at least colorable, and that such right cannot be questioned or adjudicated except in a direct proceeding by *quo warranto*.    It is also urged that the defendant has by its conduct estopped itself from denying plaintiff's right to the exercise of its alleged

franchise. The general principle that one against·whom an action has been brought by a corporation cannot, by way of defense or abatement, plead any defect in the organization of such corporation, or any forfeiture of its corporate rights or franchises, is too well established to be successfully disputed. Angell & Ames, Corporations, section 777; 2 Morawetz, Private Corporations, section 1015; *Washington College v. Duke,* 14 Iowa, 14; *Quinn v. Shields,* 62 Iowa, 129. So, also, is the general rule well established that one dealing with an association of persons as a corporation *de facto* is estopped from denying the corporate character of such association at the date of the transaction referred to. *Machine Co. v. Snow,* 32 Iowa, 433; *Cahill v. Insurance Co.,* 2 Douglass 124 (43 Am. Dec. 457); *Cotton Manufactory v. Davis,* 14 Johns. 238 (7 Am. Dec. 459); *McFarlan v. Insurance Co.,* 4 Denio, 397. But the application of these principles does not seem to be called for in this case. It may be granted that objections to the regularity of the proceedings by which an incorporation was affected, charges of abuse or misuse of a franchise, and claims of forfeiture of corporate rights or corporate capacity can be heard only on complaint of the state in *quo warranto*; but it is to be remembered that the grant of the franchise and its acceptance constitute a contract between the parties, and we think it has never been held that contract rights and obligations thus arising may not be considered and adjudicated by the courts in the same manner and by the same proceedings which obtain between litigants in general. The defendant here makes no claim that plaintiff was not at the date of the grant, or is not now, a duly incorporated organization. There is no charge or claim that the corporation has forfeited either its corporate existence or franchise. The corporation is the moving party, and comes into court asserting that by reason of the contract with the city, as indicated by the grant of 1875, it has the right to

4. FRANCHISE is a contract: violation of: ordinary action.

furnish the city water supply upon certain terms, and, alleging that such right has been violated by a certain ordinance regulating its schedule of rates, it asks that the enforcement of such ordinance be enjoined.  Such being the case, there is no good reason why the other party to the contract may not allege that the grant has expired, and that the contract, as such, has no longer any vital force or effect. Such seems to be the holding of the authorities.  An opin·ion by Chief Justice Cooley in *Bridge Co. v. Prange*, 35 Mich. 400 (24 Am. Rep. 585), is instructive upon this point. Under a statute of that state authorizing grants by boards of supervisors for the erection and maintenance of toll bridges, the plaintiff company obtained a franchise for a bridge over Grand river for a period of twenty years. After the expiration of that period it brought an ordinary action of law to recover tolls which defendant had refused to pay for the use of the bridge.  The answer put in issue the right of plaintiff to demand and receive tolls after the expiration of the time named in the grant, and the point was urged in behalf of the corporation, as it is in the present case, that such issue was in effect a collateral attack upon corporate powers and rights, which could only be questioned by *quo warranto*.  To this contention the court says:  "It is certainly true that in many cases, when a body of persons are found exercising corporate powers, and with the implied acquiescence of the sovereignty, an individual has not been allowed to dispute the corporate existence.  It is also held in those cases, and, as we think, very justly and properly, that the question whether a franchise claimed under a sovereign grant is or is not rightfully exercised should be left to be raised by the state itself, in a direct proceeding for the purpose.  *  *  *  It is also true that in cases almost innumerable it has been decided that the forfeiture of a corporate franchise cannot be collaterally taken advantage of in a private action.

*5. EXPIRATION of franchise: defense to action when?*

The doctrine is as old as the Year Books, and at this late day one would scarcely be listened to who should venture to question it. We shall not assume that it is in any manner open to controversy. But the question here in issue is not a question of corporate existence or a question of forfeiture. The defense may be perfectly valid, and the corporate existence be untouched. The corporation was brought into being and existed before the franchise of taking tolls accrued to it, by the action of the board of supervisors. That franchise was an additional privilege to those which the organization gave. It was in the nature of a grant which the oganization only clothed the corporation with capacity to receive. The grant may cease, and the corporate existence remain untouched. * * * In this case, as we have already said, there is no question of forfeiture, but there is a question of the continued existence of the franchise to take tolls. That franchise was distinct from the corporate franchise, and came into existence by grant, not directly from the state, but from the local board. The estate of the corporation in it was expressly limited to twenty years, and when that period came to an end the estate ceased, also. There was no longer color of law for taking tolls, and the failure of the state to institute proceedings could no more continue the franchise or restore it to life than the like failure in the case of one who should erect a gate across a common highway and levy like tolls. * * * A waiver cannot renew an estate which has expired by limitation." Discussing another feature of the same case, likewise pertinent to the question before us, Judge Cooley says: "The plaintiff by its organization only acquired corporate powers. It gained nothing that was originally in the control of the board of supervisors. That board was bound by nothing that so far had been done. The members of the board may not in any manner have become aware of the steps to organize until application was made to them for permission to

construct the bridge, and they were at liberty to act on such public considerations as were then presented, and with no more concession of privilege than they supposed the public interests to require. They might have consented for five years, leaving a future board at the end of that time to consent or refuse to consent according as the public good would appear to be consulted by the one course or by the other." It would be difficult to find a case more directly in point than the one from which we have thus liberally quoted, and the strength and justice of the reasoning there employed are characteristic of the eminent author. In the same general direction is the holding of the supreme court of Kansas in *Railway Co. v. Nave*, 38 Kan. 744 (17 Pac. Rep. 587, 5 Am. St. Rep. 800). In that case the railway corporation obtained a grant for the occupancy of the street, and to construct its road within six months from the date of the ordinance. It failed to perform the work within the time limited, and, upon attempting to proceed thereafter, injunction was sued out by an owner of abutting property. The court says: "The contention that the privilege granted by the ordinance remains until a forfeiture is declared is not sound. The permission conferred by the city was for a limited time, and when that time expired the privilege no longer existed. A grant of a right to construct and use a street railway, to be commenced and completed within a specified period, has been held to be terminated, without any judicial declaration of forfeiture, by failure to perform the conditions within the time named." *Oakland R. Co. v. Oakland, B. & F. V. R. Co.*, 45 Cal. 373 (13 Am. Rep. 181); *New York, H. & N. R. Co. v. Boston, H. & E. R. Co.*, 36 Conn. 196; *Railroad Co. v. Johnson*, 49 Mich. 148 (13 N. W. Rep. 492). Under a charter in which the right of repeal was reserved to the legislature, a railway company constructed and operated its road in the city of Boston. Later the legislature repealed the charter thus given, and granted to another

corporation the right to occupy the same streets, and over the same ground, occupied by the track of the former company. The first grantee sought to enjoin the enforcement of the new grant. In denying the relief sought, it was said: "Whatever right remained in the plaintiff company to its rolling stock, its horses, its harnesses, its stables, the debts due it, and the funds on hand, it no longer had any right to run its cars through the streets, or any of the streets, of Boston." In *Skaneateles Waterworks Co. v. Village of Skaneateles*, 161 N. Y. 154 (55 N. E. Rep. 562, 46 L. R. A. 687), the plaintiff company obtained a franchise for supplying the defendant city with water, and entered into a contract for that purpose for five years. At the expiration of that period the village proceeded to put in an independent plant, which in effect destroyed the value of plaintiff's property. The court does not seem to have discussed particularly the effect of the time limit, but held that the plaintiff was without remedy. The case of *Cincinnati Inclined Plane R. Co. v. City of Cincinnati* (Ohio) 44 N. E. Rep. 327,—an ordinary action at law,—presents the following situation: The railway company obtained a franchise for a street railway; the grant, like that at bar, being for a specific term of years. After the expiration of the term it continued to occupy the streets, and, by the express consent of the board of public works, expended a large amount of money in putting up poles and wires and preparing for the use of electric power. The court held that the right of the company to continue in the use of the streets could be questioned in an ordinary action, and said that, in view of the expiration of the limit of the grant, "the defendant therefore during that period was a mere trespasser upon the streets, and did not occupy them by virtue of any contract between it and the city." In *Flynn v. Water Co.* (Minn.) 77 N. W. Rep. 38, the plaintiff, as a taxpayer, was held entitled to maintain an action to enjoin the exercise of a water franchise granted by a

city in excess of its statutory authority. In *Morgan v. Insurance Co.*, 3 Ind. 285,—an action upon a promissory note given to a corporation,—it was decided that defendant was entitled to deny the existence of a corporation at the commencement of the suit. It there said: "We think the plea is substantially good. If, by a person's note, he is prevented from denying that when the note was given there was such a corporation, that is no reason why he should not allege that it did not exist when the suit was commenced. The act of corporation may, before the commencement of the suit, have expired by its own limitation." The same doctrine is recognized in, *Iron Co. v. Dawson* 4 Blackford 202. Indeed, we think it may be said no authority is to be found holding that alleged contract rights and obligations arising from the grant of a franchise or privilege by a city may not be litigated at law and in equity like ordinary rights and obligations between individual citizens. We see no reason, therefore, why the defendant may not be heard to plead the expiration of the time for which the franchise was granted.

The plaintiff sets up the grant as the basis of its demand, and the right to allege in answer that such grant has expired is as pertinent as the right to plead payment to an action upon a promissory note. In *City of Zanesville v. Zanesville Gaslight Co.*, 47 Ohio St. 1 (23 N. E. Rep. 55),—a case very much in point in the facts involved, —it is said: "It is open at all times to a person against whom a corporation may claim the right to exercise a power to call the power in question, and to require the company to show the existence of the power by deriving it either from the plain terms of its charter or the statute under which it is organized." See, also, 4 Thompson, Corporation, section 5340; *Louisville Trust Co. v. City of Cincinnati*, 22 C. C. A. 334 (76 Fed. 296). To hold otherwise is, in effect, to say that in an action brought by a corporation against a city, based upon an alleged franchise,

the only duty of the court is to ascertain what the plaintiff claims, and grant relief accordingly. *City of Ashland v. Wheeler*, 88 Wis. 617 (60 N. W. Rep. 818), cited by plaintiff, presents a question quite unlike the one before us. In that case the village of Ashland assumed to grant a franchise which was beyond its power to confer. Later it was organized as a city which did have such power, and thereafter re-enacted the ordinance granting the franchise for a term of years. There was at that time no statute which gave the city any power to repeal or alter the franchise so given. Some years later, but within the term of the grant, the city attempted to regulate and reduce the rates for water service. In furtherance of such attempt, it sought, in the case cited, to enforce a penalty against an officer of the water company for collecting illegal rates. It was held that the re-enactment by the city of the village ordinance constituted a valid contract or grant, and that the city, under the statute as it then existed, had no power to regulate the rates for service, nor could it in such proceeding be heard to question the franchise, which, as we have seen, was regularly granted and still existent. All this, we think, may be conceded without affecting the correctness of our holding in this instance. *Association v. Chamberlain* (S. D.) 56 N. W. Rep. 897, also cited, inferentially sustained the position taken by us. While holding very properly that the defendant in that case, having become a member and borrower of the plaintiff association, was estopped to deny the capacity of the plaintiff to sue, the court says: "It is true that a corporation formed in violation of law will not, as a rule, be recognized by the courts for the purpose of suing and enforcing rights founded on such illegal corporation." If such principle be applicable to corporations formed without lawful authority, it should for still stronger reasons be applied to the claim by a corporation of a franchise for which there is no statutory warrant.

But appellee insists that its case does not come within the rule of authorities we have cited, for the reason that, even if it be conceded that the attempt to grant a fran-

**6. COLOR OF right: city not bound: waiver.** chise beyond the expiration of the twenty-five-year term was *ultra vires* and void, it affords a colorable title to such franchise, and is therefore not open to question in this proceeding. This claim is based upon two propositions: First, that the terms of the grant did include the right in terms to furnish water beyond the twenty-five year limit, and, notwithstanding the lack of power to make such grant, yet, being acted upon, it affords a color of right, which can only be tested by *quo warranto*; and, second, it is said that plaintiff's color of title is shown "by possession and use for twenty-five years, by acquiescence and by waiver of the state and of all public authorities." Let us, then, inquire what is necessary to constitute color of corporate right or capacity. It will be conceded, we presume, that, where a statute exists under which parties may lawfully incorporate, and an attempt is made to organize thereunder, and especially where the organization has assumed, and for a long time has exercised, the corporate powers which a compliance with the statute would have conferred, it has acquired a colorable right to exist, even though it may be discovered that the incorporation was for some reason defective. It is a corporation *de facto*, and must be so regarded in all collateral proceedings. Its existence as a corporation *de jure* will be subject to question in direct proceedings only, and even there it is held by some authorities the right of the state to object may be barred by lapse of time. 4 Thompson, Corporation, section 5340. On the other hand, it is equally well established that no color of corporate existence can be acquired by parties claiming to be or acting as a corporation, unless there is a valid law under which they might have been incorporated by complying with its provisions. In other words, there can be

no corporation *de facto* except in cases where, by regularity of organization, it might have been, or may yet become, a corporation *de jure*. *Heaston v. Railroad Co.*, 16 Ind. 275 (79 Am. Dec. 430); *Methodist Episcopal Church v. Picket*, 19 N. Y. 487; *Eaton v. Walker*, 76 Mich. 579 (43 N. W. Rep. 638, 6 L. R. A. 102). Applying the same principle, we think it should be said that, while the defective grant of a franchise which is authorized by law may, when acted upon and used by the grantee, afford a colorable right to such privilege, yet a grant for which there is no authority in law, or which is in violation of law, cannot be made the basis of a color of right. The general rule that an *ultra vires* contract is void and unenforceable at law or in equity is, for obvious reasons, of more imperative application to acts of municipal corporations than to those of private corporations. The exception to the rule which permits the enforcement of an *ultra vires* contract which has been partly performed is not recognized in cases where the power to make the contract does not exist under any circumstances, or is expressly forbidden by statute. Dillon, Municipal Corporations, section 443; *City of Chaska v. Hedman*, 53 Minn. 525 (55 N. W. Rep. 737); *Griffin v. City of Shakopee*, 53 Minn. 528 (55 N. W. Rep. 738); *Fox v. City of New Orleans*, 12 La. Ann. 154 (68 Am. Dec. 766); *Thomas v. City of Richmond*, 79 U. S. 349 (20 L. Ed. 453); *King v. Mahaska County*, 75 Iowa, 389; *Reichard v. Warren County*, 31 Iowa, 381. In the last cited precedent we held that in such case there could be no recovery either on the contract or upon a *quantum meruit*, though there are not wanting cases from other states which seem to hold otherwise. A person dealing with a municipal corporation is held to know the extent of the power of such corporation, and, if with such knowledge, he obtains a grant for which there is no legal authoirty, or is in violation of an express statute, he does so at his peril, and obtains no right which is enforceable in

the courts.  *Snyder v. City of Mt. Pulaski*, 176 Ill. 397 (52 N. E. Rep. 62, 44 L. R. A. 407); *Franklin County v. Lewiston Inst. for Savings*, 68 Me. 43 (28 Am. Rep. 9); *McPherson v. Foster*, 43 Iowa, 48; *Johnson v. City of Indianapolis*, 16 Ind. 227; *Osgood v. City of Boston*, 165 Mass. 281 (43 N. E. Rep. 108); *Gutta-Percha & Rubber Mfg. Co. v. Village of Ogalalla*, 40 Neb. 775 (59 N. W. Rep. 513, 42 Am. St. Rep. 696).  It follows of necessity from these principles, if not, indeed, as a matter of sound public policy, that a contract or grant made by a municipal corporation without any authority of law, and accepted by the grantee with full knowledge of its unlawful character, cannot be held to give a color of right to the privilege thus attempted to be granted.  To hold that color of right is to be thus obtained is to enable city officials to ignore with impunity every statutory limitation upon municipal power, and impose upon the people burdens which the law expressly provides shall never be created.  The case of *State v. City of Des Moines*, 96 Iowa, 521, relied upon by plaintiff as supporting its claim to a colorable franchise, is easily distinguished from the one before us.  We there pointed out the same distinction which we here emphasize between a lawful act irregularly accomplished and one for which no authority exists.  We said: "The annexation in question was a legal right under the law, independent of the act held void.  It was not a void thing, as if prohibited by law;" and, as the annexation was one which might have been legally accomplished by pursuing the proper method, and as the act had been acquiesced in for such a length of time that public interests—not private interests—would suffer injury by insisting upon the invalidity of the method employed, we held the state estopped from maintaining the proceedings.  The claim of actual possession and use of the franchise by the plaintiff does not, as we veiw it, add to the strength of its position.  If we should concede for the purpose of argument that

long possession and use of a franchise which the city has no power to grant would constitute such a color of right as cannot be collaterally attacked, the record in this case does not disclose facts for the application of that principle. It is true that at the time this action was begun the plaintiff had been furnishing the city of Cedar Rapids and its people with water for twenty-five years, but such service had been rendered under a contract which, as we have held, was limited to that period, and the money and labor expended in constructing, maintaining, and operating the works must be held to have been expended with reference to the term for which it held a valid grant. Neither can there be any such acquiescence or waiver by the city as will prevent or estop it from denying the validity of an act beyond the scope of its municipal powers. A different rule sometimes obtains when the power to contract exists, but has been defectively or irregularly executed; but, if the authority to do the act or make the contract is expressly withheld or denied by law, that fact may always be set up as a defense to an action brought thereon. *Rice v. City of Osage*, 88 Iowa, 558; Bigelow, Estop. (5th Ed.) 466; *City of Cleveland v. State Bank*, 16 Ohio St. 236 (88 Am. Dec. 445). Neither can such a contract be validated by subsequent ratification. *McPherson v. Foster, supra*; *Dullanty v. Town of Vaughn*, 77 Wis. 38 (45 N. W. Rep. 1128). Nor do we see how the failure of the state to institute *quo warranto* proceedings affects the rights of the parties under the circumstances. To apply the language above quoted from Judge Cooley, "a waiver by the state cannot have the effect to revive an estate which has expired by limitation," and especially a limitation which inheres in the grant by virtue of the statute, from which alone the power to make the grant is derived. Indeed, there was nothing to call for *quo warranto.*

The corporate capacity of the plaintiff is undisputed, as is also the validity of its franchise for the full term of

twenty-five years.    This controversy arose immediately upon the expiration of that period, and whether the right of plaintiff to this particular franchise survives such expiration is, as we have endeavored to show, a question which may be raised in any action brought to enforce such claim.    It is said that to hold the franchise to have expired, and put it in the power of the city to terminate the privilege enjoyed by plaintiff, is to destroy the value of plaintiff's property, and thus perpetrate upon it a great injury.    The alleged injustice is more apparent than real.    The water company accepted the contract with the city knowing the limit placed thereon by the statute, and must be presumed to have done so with the anticipation that in twenty-five years its aggregate earnings would be such that it could afford to abandon the business in the event of the city's refusal to treat for an extension of the franchise.    That such a calculation was not altogether visionary is manifest by the showing made from plaintiff's books.    It appears therefrom that the total amount directly invested by the stockholders is represented by 2,815 shares at $50, aggregating $140,750.    Upon this investment, with a bonded indebtedness varying from $65,000 in 1877 to $150,000 in 1900, the works have paid operating expenses, repairs, and interest, and improvements, and enabled the company to distribute to its stockholders the sum of $167,425 in cash dividends, to which should be added stock dividends of $85,850 issued to represent earnings absorbed in extensions and improvements.    These figures, when taken in connection with the company's claim that the actual physical property is worth at a fair valuation from $437,000 to $478,000, would seem to indicate that the plaintiff's adventure will not prove a losing one even if the city exercises its right to treat the original contract at an end. But, assuming that it does result in a loss, such is the frequent event attending business enterprises.    Plaintiff

*7.  TERMINA-
TION of fran-
chise: effect
on property.*

entered into a contract having a definite limit, and with knowledge of the city's lawful right to insist that the limit be observed, and if by any mistake of judgment on its own part or by the exercise of any lawful power on part of the city the enterprise has proved unprofitable, it is not a ground for relief at the hands of the court. The fact that the exercise of a lawful power by the city may affect the value of plaintiff's property is also, in itself, immaterial. *Skaneateles Waterworks Co. v. Village of Skaneateles*, 161 N. Y. 607 (55 N. E. Rep. 562, 46 L. R. A. 687); *In re City of Brooklyn*, 143 N. Y. 596 (3 ; N. E. Rep. 983, 26 L. R. A. 270); *Syracuse Water Co. v. City of Syracuse*, 116 N. Y. 167 (22 N. E. Rep. 381, 5 L. R. A. 546); *Hamilton Gaslight & Coke Co. v. City of Hamilton*, 146 U. S. 258 (13 Sup. Ct. Rep. 90, 36 L. Ed. 963); *Thomson-Houston Electric Co. v. Newton*, (C. C.) 42 Fed. 723; *North Springs Water Co. v. City of Tacoma* (Wash.) 58 Pac. Rep. 773 (47 L. R. A. 214).

V. Has the city any power to prescribe or regulate the plaintiff's rates for water service? The statute which authorized the granting of the franchise (Code 1873, section 473) also provided that the company

8. WATER rates: city may determine.

might be authorized to charge and collect such rates "as may be agreed upon between the company and city." We do not think, however, that plaintiff's right to collect rates was thereby necessarily left dependent upon an agreement which might never be arrived at. *City of Des Moines v. Des Moines Waterworks Co.*, 95 Iowa, 348. The effect of the statute is little, if anything, more than a recognition of the right which already existed at common law,—the right to charge and receive reasonable compensation for service performed. In view of the fact that we hold the franchise to have expired at the end of twenty-five years, it is unnecessary to go into any discussion of the power of the city to establish a schedule of

maximum rates during the term. The term having expired the subsequent relations of the parties are to be considered with reference to the statute now in force which expressly empowers cities and towns "to regulate and fix the rates for water." Code 1897, section 725. It may be observed also that at the time the plaintiff corporation was organized the general statute governing private corporations provided (Code 1873, section 1090): "Every franchise obtained, used or enjoyed by such corporation may be regulated, withheld or be subject to conditions imposed upon the enjoyment there of whenever the general assembly shall deem necessary for the public good." And under this reserve power there seems to be no good reason why the later legislation should not be held applicable to plaintiff's franchise, without regard to the time of its expiration. The general power of the legislature to provide for the regulation of rates in any business affected with the public interest has been very generally conceded since the decision in the leading case, *Munn v. Illinois*, 94 U. S. 113 (24 L. Ed. 77). See, also, *Budd v. New York*, 143 U. S. 517 (12 Sup. Ct. Rep. 468, 36 L. Ed. 247).

VI. If, then, as we have indicated, the plaintiff's franchise to furnish the defendant city with water was limited to twenty-five years, in what relation do the parties now stand to each other? We do not

9. RATES must be reasonable.

think it necessary to go to the extent of some of the cases we have cited, and say that upon the expiration of the granted franchise the plaintiff became a trespasser upon the streets. It had been engaged in the performance of a work of public utility. That service was of a nature which, of necessity, required the occupation of the streets with pipes buried in the soil, with connections therefrom of more or less permanent character to the buildings and premises of patrons. These improvements could not be removed, nor to any extent interfered with, during the term of the franchise, without

interrupting the service the plaintiff was bound to render; and it must be presumed it was contemplated by the parties that the company should remain in possession such reasonable length of time after the expiration of the term as might be necessary to negotiate an extension or renewal of the franchise, or, in default thereof, to close out its business without unnecessary sacrifice.  Moreover, the city, by continued acceptance of the water service, and by assuming to regulate the rates thereof, gives implied consent to the present possession of the streets and operation of the works until such time as it shall by reasonable notice see fit to terminate the plaintiff's tenure of the privilege.  So long, therefore, as the plaintiff continues to perform the service and defendant continues to accept it, so long the obligation will remain upon the city and other patrons to pay a reasonable compensation therefor; and, if defendant assumes to exercise its right to prescribe the schedule, the rates so fixed by it must not be arbitrary or destructive of the property employed in its service.  The right to regulate is not unlimited, and, if the schedule be made so low that its adoption will operate as a confiscation of the water company's property without due process of law, the courts will interfere to prevent its enforcement.  *Turnpike Co. v. Sandford*, 164 U. S. 578 (17 Sup. Ct. Rep. 198, 41 L. Ed. 560); *Reagan v. Trust Co.*, 154 U. S. 362 (14 Sup. Ct. Rep. 1047, 38 L. Ed. 1014); *Railroad Commission Cases*, 116 U. S. 307 (6 Sup. Ct. Rep. 334, 29 L. Ed. 636); *San Diego Land & Town Co. v. National City*, 19 Sup. Ct. Rep. 810 (174 U. S. 739, 43 L. Ed. 1154).  But the conclusion that a schedule of rates duly adopted by proper authority will have such destructive effect is not to be lightly assumed, nor found from doubtful or uncertain premises.  It is said by our highest judicial authority that "the judiciary ought not to interfere with the collection of rates established under legislative sanction,

*10. RATES: when court will interfere: reasonableness of.*

unless they are so plainly and palpably unreasonable as
to make their enforcement equivalent to the taking of
property for public use without such compensation as, un-
der all the circumstances, is just to both the owner and
the public; that is, judicial interference should never occur
unless the case presents clearly and beyond all doubt such
a flagrant attack upon the rights of property under the
guise of regulations as to compel the court to say that the
rates prescribed will necessarily have the effect to deny
just compensation for private property taken for public
use." *San Diego Land & Town Co. v. National City,*
*supra.* Let us inquire, then, whether, in the case before
us, it does appear "clearly and beyond all doubt" that
the water rates prescribed by the defendant's ordinance
are of such a "flagrant" character as to involve the de-
struction or confiscation of plaintiff's property. The
decided cases furnish no definite rule for our guidance.
To adopt the thought expressed by Mr. Freeman (*San
Diego Water Co. v. City of San Diego* [Cal.] 50 Pac. Rep.
633 [38 L. R. A. 460, 62 Am. St. Rep. 297], note), the
courts, "in reaching the conclusion that the question of
reasonableness is a judicial question, have discovered the
threshold of the door through which they must necessarily
pass, and thence wander in search of other landmarks to
guide their future course. There are as yet no beacon
lights by which to distinguish the reasonable from the
unreasonable, or, if any there are, they are so dim that
little aid can be given by them." But we think a study
of the cases we have cited and the manifest tendency of
current decisions. justify us in assuming that, while the
original cost of the works, their present value, the cost of
replacing them if destroyed, the amount of stocks and
bonds outstanding, the gross and net income, the nature
and extent of the services rendered, rates of interest, and
other kindred matters, are all proper to be considered in
arriving at a conclusion upon the reasonableness of the

schedule, no one of them should be accorded controlling influence.   The supreme court of the United States has stated the principle thus:  "It cannot be said that a corporation is entitled as of right and without reference to the interests of the public, to realize a given per cent. upon its capital stock.  *  *  *  Each case must depend upon its especial facts; and where a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature are, as an entirety, so unjust as to destroy the value of the property for all the purposes for which it was acquired, its duty is to take into consideration the interests of both the public and the owner of the property, with all other circumstances that are fairly to be considered, in determining whether the legislature under the guise of regulating rates, exceeded its constitutional authority, and practically deprived an owner of his property without due process of law."  *Turnpike Co. v. Sandford,* 164 U. S. 578 (17 Sup. Ct. Rep. 198, 41 L. Ed. 560); *San Diego Land & Town Co. v. National City, supra.*   We shall not attempt to go into any minute statement or analysis of the figures and computations relied upon by counsel.   Some of the items by which plaintiff increases the alleged value of the works and reduces the showing of net earnings, as well as other items by which the defendant decreases the former and increases the latter, we think are unwarranted.   The testimony, when taken as a whole, and considered in the light of all the proved and admitted circumstances, indicates the present fair value of the company's property to be somewhere from $400,000 to $500,000.   The total earnings of the works, as charged upon plaintiff's books, for the year preceding the trial in the district court, were, in round numbers, $59,000, subject however, to some discounts for advance payments.   Of this income about one-third is charged to the city, and is not affected by the ordinance in controversy.   The other two-thirds are collected from private

consumers, and the charges for such service are reduced by the ordinance in varying proportions. Just the extent which this reduction will affect the company's earnings it is impossible to prove or predict with certainty, but we see no reason to believe that the total revenue, after making all due allowance for discounts, will be reduced below $50,000. The operating expenses charged for the year preceding the trial (being largely in excess of the average in its experience) were $23,000, or, including taxes, $28,000. On this basis the net earnings are five and one-half per cent. on a valuation of $400,000 or four and two-fifths per cent. on a valuation of $500, 00, or six and one-half per cent. on the total amount of capital stock and bonds. Stated otherwise, this will enable the company to pay its interest charge of $7,500, make a dividend of five per cent. on its capital stock (including stock issued as dividends), and leave a margin of over $3,000 for contingencies. This estimate of earnings may be very materially reduced, or the estimate of the value of the plant be very materially increased, before the court will be justified in saying that the plaintiff's property is being exposed to destruction or confiscation by an unprofitable schedule of rates.

It is proper here to say that in reaching these conclusions we have not attempted any estimate of the "going value" of the waterworks as a distinct and severable item in the calculation. By "going value" we understand is meant that value which arises from having an established "going" business. While not the exact equivalent of "good will," as applied to ordinary business, it is of a somewhat similar nature, and attaches to the business, rather than to the property employed in such business. The fact that the business is established is, of course, a material fact in ascertaining the value of the plant, and especially is this true where the property is being estimated for the purposes of sale or condemnation; but as

a basis for estimating profits its significance is less apparent. The merchant who sells an established business may properly place a high value on the good will which he relinquishes to the buyer; but so long as he continues in the enjoyment of the business he has created he does not add the value of the good will to his capital stock in estimating the percentage of his annual profits. So, also, we may say we see no reason why plaintiff, in addition to operating expenses, repairs, and other ordinary charges, should be allowed to reduce the apparent profits by deductions for a restoration or rebuilding fund. The setting aside of such a fund may be good business policy, and, if the company sees fit to devote a portion of its profits to that purpose (though, as we understand the record, no such fund has yet been created), no one can complain; but it is in no just sense a charge affecting the net earnings of the works. To hold otherwise is to say that the public must not only pay the reasonable and fair value of the services rendered, but must, in addition, pay the company the full value of its works every forty years—the average period estimated by plaintiff—for all time to come. We have pursued this subject far enough to demonstrate that, even taking the high estimate of value which plaintiff places upon its property, and its own showing of earnings, there is nothing in the ordinance sought to be nullified which calls for judicial interference. The net earnings upon this showing, if not large, are substantial. The court cannot undertake to guaranty the company any fixed or certain return upon its investment. The exercise of such a power would work an utter destruction of the legislative right to regulate rates of water companies and other corporations operating works of public utility. We think the decisions have already gone to the verge of safety in nullifying legislative acts of this character; and to go farther, and say that the courts will not only preserve property from confiscation and destruction by legislative

power, but will also assure to its 'owners a definite and fixed rate of profit upon their investment, would be, an act of judicial usurpation.

The decree of the district court is REVERSED.